IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FLORETTA JACKSON §

VS. § CIVIL ACTION NO.2:04cv331

COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION §

## **MEMORANDUM OPINION AND ORDER REMANDING**

On September 17, 2004, Plaintiff initiated this civil action pursuant to the Social Security Act (The Act), Section 205(g) for judicial review of the Commissioner's denial of Plaintiff's application for Social Security benefits.

### **Procedural History**

On October 24, 2001, Plaintiff filed a Title II application and a Title XVI application, each alleging inability to work. Plaintiff alleges inability to work due to seizure disorder, left knee pain, left shoulder pain, and inability to bend and stand for long or walk. *Tr*. at 57. Plaintiff timely filed a request for a hearing before an Administrative Law Judge (ALJ). After a hearing, the ALJ denied benefits.

On August 6, 2004, the Appeals Council denied Plaintiff's request for review. *Tr*. at 3-5. Consequently, the ALJ's decision became the Commissioner's decision. *See Sims v. Apfel*, 530 U.S. 103 (2000); 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, and 422.210(a). Plaintiff sought review by this Court.

### **Standards**

In reviewing a denial of Social Security disability benefits, a federal court carefully considers

the following:

1. standards of both judicial review and entitlement to Social Security benefits (*Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000));

2. all available evidence (*Homan v. Comm'r of Soc. Sec. Admin.*, 84 F. Supp. 2d 814, 815 (E.D. Tex. 2000));

3. the transcript and entire record (*Jimmerson v. Apfel, Comm'r of Soc. Sec.*, 111 F. Supp. 2d 846, 846 and 849 (E.D. Tex. 2000); *cf. Jackson v. Apfel, Comm'r of Soc. Sec.*, 234 F.3d 246 (5th Cir. 2000) (considering the record)); and

4. the parties' briefs (*Jackson*, 234 F.3d 246).

In federal judicial review of the denial of Social Security disability benefits, a strong presumption exists in favor of the defendant. *Jimmerson*, 111 F. Supp. 2d at 849.

A federal court reviews the Commissioner's determination that a claimant was not disabled only to determine whether the Secretary applied the proper legal standard and whether the determination is supported by substantial evidence (*Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994), *cert. denied*, 514 U.S. 1120 (1995); 42 U.S.C. § 405(g)) in light of the whole record (*Boyd v. Apfel, Comm'r of Soc. Sec.*, 239 F.3d 698 (5th Cir. 2001); *Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g)). A federal court must affirm the Commissioner's determination that a claimant was not disabled unless that determination either is not supported by substantial evidence or involved an erroneous application of legal standards in evaluating the evidence. *Carey v. Apfel, Comm'r of Soc. Sec.*, 230 F.3d 131, 135 (5th Cir. 2000); *cf. Masterson*, 309 F.3d at 272. A federal court may not substitute its "judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey*, 230 F.3d at 135 and 146. Substantial evidence is "more than a scintilla but less than a preponderance." *Masterson*, 309 F.3d at 272. Substantial evidence is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Myers v. Apfel, Comm'r of Soc. Sec.*, 238 F.3d 617 (5th Cir. 2001).

Medical records play a significant role in reviewing the ALJ's decision. *Greenspan*, 38 F.2d at 238. In determining whether substantial evidence supports the decision, a court considers the following medical evidence:

1. objective medical facts (*Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); Social Security Ruling (SSR) 96-7p; *cf.* 20 C.F.R. § 404.1529(c)(2));

2. treating and examining physicians' diagnoses, opinions (*Martinez*, 64 F.3d at 174), statements, and reports (*Loza*, 219 F.3d at 393; *see also Richardson*, 402 U.S. at 402; SSR 96-7p; *cf.* 20 C.F.R. § 404.1529(c)(2));

3. clinical findings (*Homan*, 84 F. Supp. 2d at 818; *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir.1987));

4. the claimant's medical history (*Loza*, 219 F.3d at 393; *see also* 20 C.F.R. § 404.1512(b)(1)-(6));

5. statements and reports from the claimant and from treating or examining psychologists and other persons about the claimant's medical history, treatment, and response (SSR 96-7p; *cf.* 20 C.F.R. § 404.1529(c)(2)); and

6. other information concerning the claimant's symptoms and how they affect the claimant's ability to work (SSR 96-7p; *cf.* 20 C.F.R. § 404.1529(c)(2)).

Medical evidence must support a physician's diagnosis. *Loza*, 219 F.3d at 393; *see also* 20 C.F.R. § 404.1527(d)(2). Generally, the opinions, diagnoses, and medical evidence of a treating physician familiar "with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395.

A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Boyd*, 239 F.3d 698. If substantial evidence supports the

denial, then a court must accept it. *Brown v. Apfel*, 192 F.3d 492 (5th Cir. 1999); *Jimmerson*, 111 F. Supp. 2d at 848; *see also* 42 U.S.C. § 405(g).

To determine disability, the Commissioner uses a five-step analysis. *Boyd*, 239 F.3d 698; *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520. At steps one through four, the claimant has the burden of proof. *Masterson*, 309 F.3d at 272; 20 C.F.R.§ 404.1520. If a claimant bears the burden at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work, then the burden shifts to the Commissioner at step five. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); *Boyd*, 239 F.3d 698; 20 C.F.R. § 404.1520(f); Acquiescence Ruling 00-4(2); *see also Greenspan*, 38 F.3d at 236; *Masterson*, 309 F.3d at 272. A finding that the claimant is or is not disabled at any point in the five-step process is conclusive and terminates the analysis. *Boyd*, 239 F.3d at 705.

At step one, to qualify for Social Security disability benefits the claimant must not be working "presently at any substantial gainful activity." *Boyd*, 239 F.3d at 704; *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(a)-(b). At step two, to qualify for Social Security disability benefits the claimant must have a severe impairment. *Boyd*, 239 F.3d 698; *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. *Shave v. Apfel, Comm'r of Soc. Sec.*, 238 F.3d 592 (5th Cir. 2001).

At step three the Commissioner compares the medical evidence of the claimant's impairment(s) to the impairments listed in the regulations appendix. *Shave*, 238 F.3d 592; 20 C.F.R. § 404.1520(d); *see also Boyd*, 239 F.3d 698; *Greenspan*, 38 F.3d at 236. The impairment list is in

20 C.F.R. Part 404, Subpart P, Appendix 1. *Boyd*, 239 F.3d 698; 20 C.F.R. § 404.1520(d)If the claimant's impairment meets or equals a listed impairment, then he qualifies for benefits without further inquiry. *Boyd*, 239 F.3d 698; *Greenspan*, 38 F.3d at 236; *see also* 20 C.F.R. § 404.1520(b)-(e). If the claimant's impairment does not match or equal a listed impairment, then the evaluation proceeds to step four. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(e).

The issue at step four is whether the claimant's impairment prevents him from performing his past relevant work. *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(e). The residual functional capacity assessment is used "to determine whether an individual is able to do past relevant work." SSR 96-8p at 2.

Residual functional capacity is a medical assessment of what a claimant can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his medically determinable impairments. SSR 83-10 at 7. The residual functional capacity assessment must identify the claimant's functional limitations or restrictions and assess the claimant's work-related abilities on a function-by-function basis, including the functions in 20 C.F.R. § 404.1545(b), (c), and (d) before expressing residual functional capacity in terms of sedentary, light, medium, heavy, and very heavy exertional levels of work. SSR 96-8p at 1. Title 20 C.F.R. § 404.1545(b) includes the functions of walking, standing, sitting, pushing, pulling, lifting, carrying, and other physical functions, including manipulative or postural functions, such as reaching, handling, stooping, and crouching. Title 20 C.F.R. § 404.1545(c) includes mental abilities such as limitations in understanding, remembering, and carrying out instructions; and in responding appropriately to supervision, co-workers, and work pressures in a work setting. Title 20 C.F.R. §

404.1545(d) includes other abilities that impairments affect, such as skin impairment(s); epilepsy; impairment(s) of vision, hearing, or other senses; and impairment(s) imposing environmental restrictions.  20 C.F.R. § 404.1545(d).

A claimant's residual functional capacity is determined by combining a medical assessment of the claimant's impairments with descriptions by physicians, the applicant, or others of any limitations on the claimant's ability to work.  *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).  The Social Security Administration (SSA) assesses residual functional capacity based on all relevant record evidence of a claimant's ability to do work-related activities; relevant record evidence of a claimant's ability to do work-related activities includes acceptable medical sources and information about the claimant's symptoms.  SSR 96-8p.  Acceptable medical sources for determining residual functional capacity include medical source statements; medical source statements are opinion evidence.  *Id*.

An ALJ's determination of residual functional capacity must not be based on subjective symptomatology alone, but must be based on objective evidence, including results of medically acceptable clinical tests and laboratory diagnostic techniques, which demonstrate disability as defined in the Social Security Act and Regulations.  *Hollis*, 837 F.2d at 1382.  An ALJ has discretion to give no weight to a physician's opinion about a claimant's residual functional capacity (*cf. Greenspan*, 38 F.3d at 237) as long as he gives appropriate explanations for doing so (*see Newton*, 209 F.3d at 456; SSR 96-5p).  At step four, if the claimant is capable of performing his past relevant work, then he is not disabled.  *Boyd*, 239 F.3d 698; *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(e).

At step five the Commissioner must show that in light of the claimant's residual functional capacity, age, education, and past work experience, the claimant's impairment does not prevent his doing any other work. *Boyd*, 239 F.3d 698; *Greenspan*, 38 F.3d at 236; *see also* 20 C.F.R. § 404.1520(b)-(e). Any other work includes any other kind of substantial gainful work existing "in significant numbers in the national economy." 20 C.F.R. §§ 404.1520(f) and 404.1569a(a); *Loza*, 219 F.3d at 390; *Greenspan*, 38 F.3d at 236.

If SSA meets this burden of showing that the claimant can perform relevant work, then the claimant must prove that he cannot in fact perform the work suggested. *Boyd*, 239 F.3d at 705. If a claimant cannot do his past work or other work, then the claimant qualifies for benefits. *Loza*, 219 F.3d at 390; *see also Sullivan*, 493 U.S. at 525-26; 20 C.F.R. § 404.1520(e)-(f).

The ALJ is the fact finder. *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991). "[T]he ALJ has sole responsibility for determining a claimant's disability status." *Newton*, 209 F.3d at 455.

In disability proceedings, the administrative agency administering the Social Security benefits program has discretion to make credibility choices between conflicting medical evidence. *See Floyd v. Bowen*, 833 F.2d 529, 532 (5th Cir. 1987). The authority to determine credibility belongs to the ALJ, who weighs the credibility in making fact findings. *Greenspan*, 38 F.3d at 237. The ALJ must determine the credibility of medical experts and weigh their opinions accordingly. *Ferguson v. Secretary of HHS*, 919 F. Supp. 1012, 1021 (E.D. Tex. 1996); *cf. Greenspan*, 38 F.3d at 237. In determining the credibility of medical experts and weighing their opinions, an ALJ has broad discretion. *Lewis v. Secretary of HHS*, 782 F. Supp. 56, 58 (E.D. Tex. 1991). The ALJ may determine credibility of medical reports. *Eaves v. Secretary of HHS*, 877 F. Supp. 334 (E.D. Tex. 1995).

A treating physician's opinions are not conclusive. *Newton*, 209 F.3d at 455. The ALJ can reject a treating physician's opinion if the evidence supports a contrary conclusion. *Martinez*, 64 F.3d at 176.

If SSA disregards a treating physician's opinion, a court scrutinizes the record to determine whether the Secretary weighed the opinion and determined whether it was consistent with the medical signs and findings. *Hollis v. Bowen*, 832 F.2d 865, 867 (5th Cir. 1987). If the ALJ disregards a treating physician's opinion, a court scrutinizes the ALJ's decision to determine whether the ALJ:

1. reviewed all the relevant evidence (*Barajas v. Heckler*, 738 F.2d 641, 645 (5th Cir. 1984));

2. carefully considered the opinion (*Babineaux v. Heckler*, 743 F.2d 1065, 1068 (5th Cir. 1984));

3. weighed the opinion (*Brady v. Apfel*, 41 F. Supp. 2d 659, 668 (E.D. Tex. 1999));

4. made his decision based on evidence contradicting the treating physician's opinion (*Milam v. Bowen*, 782 F.2d 1284, 1287 (5th Cir. 1986); and/or

5. made a credible choice (*Barajas*, 738 F.2d at 645).

The Secretary is required to give good reasons in the notice of determination or decision for the weight given to opinions of a claimant's treating sources. 20 C.F.R. § 416.927.

**Facts**

*Background – Age and Education*

At the time of the ALJ's decision, April 13, 2004, Plaintiff was a forty-four-year-old with a high school education. *Tr.* at 12. Plaintiff alleges a disability onset date of February 28, 1999. *Tr.* at 38.

*Medical Facts and Opinions*

Plaintiff's medical history notes the following: chronic knee pain, depression (*Tr.* at 72), previous ACL repair of left knee, seizure disorder, neuropathy, neuritis of both feet (*Tr.* at 73), osteoarthritis of bilateral knees (*Tr.* at 75 and 77), panic disorder (*Tr.* at 111), anemia, chronic disease, C5-6 disc herniation (*Tr.* at 115), MRI of brain showing (a) encephalomalacia of the right hippocampal gyrus and (b) mild inflammatory changes in the left maxillary antrum (*Tr.* at 120), MRI of the left knee showing (1) findings of chronic anterior cruciate ligament rupture, (2) appearance to the posterior horn of the medical meniscus suggesting superimposed tear, (3) focal signal abnormality involving the posterior aspect of the lateral femoral condyle most consistent with an osteochondral defect or focal contusions with a chronic appearance and no overlying cartilaginous defect noted (*Tr.* at 131-32), left hip pain (*Tr.* at 133), ACLS injury to left knee, needing surgery, degenerative disc disease (*Tr.* at 140), and radiculopathy of the left arm (*Tr.* at 116).

*St. Michael's Hospital*

A January 4, 2000, Discharge Summary Sheet notes a magnetic resonance imaging of the cervical spine showing focal herniation of the C5-6 disk to the left. When informed of the results of her cervical spine magnetic resonance imaging, Plaintiff indicated that a couple of months ago she had a seizure and fell against the left shoulder and has had pain on that side since, going from the neck down her arm consistent with radiculopathy. *Tr.* at 115-16.

*Glenn-Barrett Clinic*

A March 3, 2000, Progress Note notes the following:

"Ms. Jackson has painful left knee. This patient with previous arthroscopic repair of an ACL in the left knee, has had pain since mid February. She reinjured her knee playing basketball. Since that time has had difficulty walking. She has had her knee immobilizer back on, again walking with crutches. . . . 2. Continue crutch walking.

3. This patient is currently uninsured. I have informed her to return or call me if there is no improvement within 2 weeks. Her orthopedic surgeon is Dr. Hampton."

*Tr*. at 113. A July 21, 2000, Progress Note states, "This patient has been having a lot of problems with knee. She has surgery on this in the past for repair of ACL. She has an effusion noted. I have discussed this patient with Dr. Early and I have aspirated this and 30 cc's of yellowish joint fluid." *Tr*. at 111. Medical staff advised no further therapy for her knee. She was to wear a wrap, avoid injury, and continue her activities. Medical staff noted that they "may proceed with orthopedic consultation when this patient desires to do so." *Tr*. at 111.

A January 15, 2001, Progress Note says the following:

"This patient is waiting to go through the Texas Rehab and still is uninsured. She still has chronic knee pain in the left knee and her back is giving her some problems. I think this is due to the limping from the problem with her left knee. It would be good to have an MRI and referral to an orthopedic surgeon but she cannot afford this at this time. She has gotten some relief of pain in the past with knee injection."

*Tr*. at 72. A February 2001, Progress Note says, "She has good pedal pulses, but has painful toes that make walking difficult, she can walk no further than about 20 feet without having to stop and rest due to the pain in her feet from neuritis. Tegratol level is also subtherapeutic at 5.7." *Tr*. at 73.

In a September 19, 2003, Progress Note, at the Glenn-Garrett Clinic, Dr. Simmons rendered an opinion that Claimant is disabled:

"Floretta is in a predicament because she does not qualify for disability. As far as I am concerned, she is definitely disabled. She has a seizure disorder, neuropathy of the lower extremities, failed low back and knee that is shot which she needs surgery on. She has been getting her medication supplied through the mail in program. She comes in today as her medicine has run out."

*Tr*. at 140. He diagnosed her as having neuropathy; ACLS injury to the left knee, needing surgery; and chronic low back pain as a result of probable degenerative disc disease. *Tr*. at 140.

*Dr. M. Panjwani*

In a January 15, 2002, Letter Report, Dr. M. Panjwani noted the following:

"She is wearing a knee brace on the left side. She has some crepitus on her left knee. She has some decreased range of motion as indicated in the range of motion sheet on the left knee. She was able to bend down and touch her toes. She was not able to squat down because of the pain in her left knee and she did not attempt to stand on her toes and on her heels."

*Tr*. at 81-83.

*Wadley Regional Medical Center*

A July 9, 2002, MRI of the left knee shows the following:

"Impression: 1. Findings of chronic anterior cruciate ligament rupture. 2. Appearance to the posterior horn of the medial meniscus suggesting chronic meniscal tear without definite evidence of acute superimposed tear. 3. Focal signal abnormality involving the posterior aspect of the lateral femoral condyle most consistent with an osteochondral defect or focal contusion. This has a chronic appearance and no overlying cartilaginous defect is noted."

*Tr*. at 131-32.

*Dr. Roshan Sharma*

On November 19, 2003, Dr. Roshan Sharma opined as follows:

"She describes her lower back, (L) hip and (L) knee pain as a strong pain. Grades her pain as grade 10 by 10. Says she has five bad days in a week, and no more than 2 good days in a week, where her pain grading goes down to grade 6 by 10. No true radiation of pain, but says pain does go into her shoulders and neck. She has morning stiffness lasting 1 to 2 hours. Walking, standing aggravates her pain. Sitting with legs elevated does help."

*Tr*. at 133.

*The Hearing*

At the hearing, Plaintiff and a vocational expert testified. *Tr.* at 168. Plaintiff testified that after being laid off, she began having medical problems. *Tr.* at 172. In 1996 she had surgery on her left leg and then re-injured it. *Tr.* at 172. When Plaintiff cannot control her pain, she sees Dr. Simmons. *Tr.* at 173. Plaintiff has not had the recommended knee surgery because of lack of financial resources. *Tr.* at 173. Her left leg swells and she has severe pain if she tries to lift more than five pounds. *Tr.* at 174. She has spasms in her back and hip. *Tr.* at 174. She is on seizure medication. *Tr.* at 175.

> The ALJ gave the following hypothetical to the vocational expert:
>
> Q. Assume you're dealing with an individual the same age as Claimant, with the same educational background and past work experience. Further assume that the individual is limited to sedentary work. The individual would have to observe routine seizure precautions, such as avoiding heights, dangerous machinery, that sort of thing. The individual would also have to have a job in which there would only be superficial interpersonal contact, and finally, the work would have to be of an unskilled nature. Now I believe all the past work would be precluded on exertional considerations, alone. Could the individual perform other jobs in the local, regional, or national economy?
>
> A. Yes, sir. At the unskilled sedentary level, she could do those basic hand-assembler type jobs. Examples are your band attachers or your mounters or your polishers or your adjusters. We have over 40,000 in the regional and over 800,000 nationally.
>
> Q. All right. Second hypothetical, the same age, education, and past work experience as before. This time, assume that the individual has a medical condition resulting in chronic pain, to the extent that the individual is unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis. Could this individual perform any of the Claimant's past jobs?
>
> A. No, sir.
>
> Q. Could this individual perform other jobs in the local, regional, or national economy?
>
> A. Not within those limits, Your Honor.

*Tr.* at 182-83.

*ALJ's Decision*

On April 13, 2004, the ALJ issued an opinion denying benefits to Plaintiff. *Tr.* at 18. Following the five-step evaluation process, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. *Tr.* at 17. At step two the ALJ determined that Plaintiff has severe impairments. *Tr.* at 17. The ALJ noted that she first hurt her knee in 1996 playing basketball and had to undergo surgery to repair a torn anterior cruciate ligament. The ALJ noted that she reinjured her knee in 2000 and has had problems with pain and swelling since that time. The ALJ acknowledged a statement made in her records from a treating source statement that "Floretta is in a predicament because she does not qualify for disability. As far as I am concerned, she is definitely disabled. She has a seizure disorder, neuropathy of the lower extremities, failed low back and knee." The ALJ stated that this was a on September 19, 1993 medical record (*Tr.* at 14); however, it is dated on September 19, 2003 (*Tr.* at 140). The ALJ stated the following:

> "Following the hearing, the claimant was seen by a physical medicine and rehabilitation specialist, Roshan Sharma, M.D. (Exhibit B8F). Dr. Sharma found that she had a normal range of motion in all joints and areas of the spine, even her left knee and hip. He found her intact neurologically and noted that her muscle strength was grossly within normal limits. She was able to squat and arise from a squatting position. In a separate medical source statement, he found that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently. As far as postural activities, he found that she can do everything but climb (never) and balance (occasionally). She should, of course, avoid unprotected heights and dangerous machinery. The Administrative Law Judge acknowledges the MRI report of July 2002 which revealed a ruptured anterior ligament (Exhibit B7F). This has been taken into consideration in arriving at her residual functional capacity below. . . Her daily activities are limited but not inordinately restricted.

*Tr.* at 15-16.

At step three the ALJ found that Plaintiff did not meet the listings, stating: "The medical evidence indicates that the claimant suffers from a seizure disorder, the residual effects of left knee surgery, and mild depression, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P Regulations No. 4." *Tr*. at 13.

At step four the ALJ gave this opinion: "Her most obvious functional limitations stem from her knee injury." He concluded the following:

> "Based on the record as a whole, the Administrative Law Judge finds that claimant retains the residual functional capacity for unskilled sedentary work that allows for observance of the standard seizure precautions and involves only superficial interpersonal contact. Even though Dr. Sharma found that she had normal ability to stand and walk, her chronic knee problem would preclude extended standing or walking in the judgment of the Administrative Law Judge. In this respect, Dr. Sharma's report is not given full probative weight."

*Tr*. at 15-16. The ALJ stated the following:

> "The Claimant alleges that activities such as walking or standing aggravate her knee pain and this is a credible statement as far as it goes. However, it does not necessarily follow that she would be unable to perform all work activity. This allegation was taken into consideration in assessing her residual functional capacity. . . Although her wages were relatively meager, she had consistent earnings for a 20 year period. The Administrative Law Judge finds that her work record would weigh in her favor; however, this is only one factor among many and the evidence as a whole does not fully support her basic contention that she is unable to engage in any work activity."

*Tr*. at 15-16.

The ALJ found that Plaintiff has the residual functional capacity to perform unskilled sedentary work allowing for observance of the standard seizure precautions and involving only superficial interpersonal contact. *Tr*. at 17. The ALJ found that Plaintiff cannot perform her past relevant work. *Tr*. at 17. The ALJ found that Plaintiff can perform work existing in significant

numbers in the national economy. *Tr*. at 18. Therefore, the ALJ concluded that Plaintiff is not entitled to a period of disability or disability insurance benefits under the Act. *Tr*. at 18.

**Discussion**

Plaintiff raises the issues of whether (1) the ALJ erred by failing to give substantial weight to treating physician Simmons' opinions that Plaintiff is disabled and has a "failed back," (2) SSA's decision was not supported by substantial evidence because SSA failed to appropriately develop the records where Plaintiff was unrepresented at the hearing, the record shows that she could not afford treatment or medications, and the ALJ had no basis for discrediting Plaintiff, (3) SSA's Step 3 and Step 4 findings are not supported by substantial evidence, (4) the ALJ erred in failing to give the vocational expert a hypothetical including Plaintiff's chronic hip and back pain, herniated C5-6 disc with radiculopathy, and need for knee surgery, and (5) newly discovered evidence unavailable at the time the Commissioner rendered the decision denying benefits requires remand for inclusion in the record.

In a September 19, 2003, Progress Note, at the Glenn-Garrett Clinic, her physician rendered an opinion that Claimant is disabled:

> "Floretta is in a predicament because she does not qualify for disability. As far as I am concerned, she is definitely disabled. She has a seizure disorder, neuropathy of the lower extremities, failed low back and knee that is shot which she needs surgery on. She has been getting her medication supplied through the mail in program. She comes in today as her medicine has run out."

*Tr*. at 140. He diagnosed her as having neuropathy; ACLS injury to the left knee, needing surgery; and chronic low back pain as a result of probable degenerative disc disease. *Tr*. at 140.

The ALJ noted that Claimant testified at the most recent hearing that she no longer sees Dr. Early, but a Dr. Simmons. The ALJ acknowledged the statement that "Floretta is in a predicament

15

because she does not qualify for disability. As far as I am concerned, she is definitely disabled. She has a seizure disorder, neuropathy of the lower extremities, failed low back and knee." The ALJ stated that this was a on September 19, 1993, medical record (*Tr*. at 14); however, it is dated on September 19, 2003 (*Tr*. at 140). The ALJ stated the following:

> "Following the hearing, the claimant was seen by a physical medicine and rehabilitation specialist, Roshan Sharma, M.D. (Exhibit B8F). Dr. Sharma found that she had a normal range of motion in all joints and areas of the spine, even her left knee and hip. He found her intact neurologically and noted that her muscle strength was grossly within normal limits. She was able to squat and arise from a squatting position. In a separate medical source statement, he found that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently. As far as postural activities, he found that she can do everything but climb (never) and balance (occasionally). She should, of course, avoid unprotected heights and dangerous machinery. The Administrative Law Judge acknowledges the MRI report of July 2002 which revealed a ruptured anterior ligament (Exhibit B7F). This has been taken into consideration in arriving at her residual functional capacity below. . . Her daily activities are limited but not inordinately restricted.

*Tr*. at 15-16. The ALJ mistakenly evaluated the treating source's September 19, 2003, statement as being made ten years earlier, and then he acknowledged consideration of the 2002 MRI. Failure to consider the two documents together in the proper time frame certainly may have impacted the weight which the ALJ gave to both records.

In discussing the treating source's September 19, 2003, statement, the ALJ noted that he was "really unclear if the statement was made by" her treating physician, or a nurse, or a nurse practitioner, and that neither a nurse nor nurse practitioner is an acceptable medical source under the Social Security regulations. *Tr*. at 14. The ALJ then said that even if the statement that Plaintiff had a "failed back" was from a treating source, the record shows "virtually no treatment or objective findings relative to back or shoulder pain." *Tr*. at 14. However, the medical record evidence shows objective evidence of a herniated disc at C5-6. Additionally, the medical record evidence documents

left shoulder pain, problems with her left shoulder, and a herniated disc in her neck area that limits her ability to function normally. *Tr*. at 81. M. Panjwani, M.D. diagnosed Plaintiff's condition as including left shoulder and upper back pain that appears to be musculoskeletal or maybe arthritic and limits her from functioning normally. *Tr*. at 84.

Furthermore, the record does not indicate that the ALJ attempted to recontact the Glenn-Garrett Clinic to determine whether the record is that of Dr. Early. After concluding that the medical records show no objective findings relative to back pain, the ALJ concluded that Plaintiff's residual functional capacity is not limited due to back pain or the herniated C5-6 disc.

Plaintiff disagrees with the Administrative Law Judge's Step 3 finding that she does not have impairments and/or a combination of impairments equal to one listed in 20 C.F.R. § 404.1501, et seq., Appendix 1. A Glenn-Garrett Clinic physician noted Plaintiff's chronic knee pain and gave her a knee injection. *Tr*. at 72. J. Harris, M.D. diagnosed Plaintiff as having osteoarthritis in both knees. *Tr*. at 75. An MRI of the left knee showed: 1) findings of chronic anterior cruciate ligament rupture; 2) appearance to the posterior horn of the medial meniscus without definite evidence of acute superimposed tear; and 3) focal signal abnormality involving the posterior aspect of the lateral femoral condyle most consistent with an osteochondral defect or focal contusion, with a chronic appearance. *Tr*. at 131. Examination showed that she was unable to squat down because of left knee pain. *Tr*. at 83. The ALJ concluded that Plaintiff's most obvious functional limitations stem from her knee injury. Plaintiff contends that the ALJ had no basis to discredit her contention that she is unable to squat because there has been no showing of exaggeration of symptoms or symptom magnification by the Plaintiff and the ALJ did not properly apply the factors listed in *Polaski*.

At step 4 the ALJ found that Plaintiff retains the residual functional capacity to perform unskilled sedentary work allowing for observance of the standard seizure precautions and involving only superficial interpersonal contact. To be capable of performing sedentary work, a claimant must be able to stand occasionally (*Vaughan v. Shalala*, 58 F.3d 129, 131 n. 1 (5th Cir. 1995); walk occasionally (*Id.*; 20 C.F.R. § 404.1567(a); SSR 83-10 at 5); sit for approximately six hours out of an eight-hour work day (*Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *cf.* 20 C.F.R. § 404.1567(a)), with a morning break, a lunch period, and an afternoon break at approximately two-hour intervals (SSR 96-9p at 6); lift ten pounds at a time (*Ripley*, 67 F.3d at 557; 20 C.F.R. § 404.1567(a); SSR 83-10 at 5); and occasionally lift or carry articles like docket files, ledgers, and small tools (*Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); 20 C.F.R. § 404.1567(a); SSR 83-10 at 5).

Plaintiff contends that it is not clear from the record whether the ALJ considered Plaintiff's alleged lack of financial resources when denying benefits, and that the ALJ should have addressed the issue in his decision. The most significant difference between decision making by SSA and by the courts is that SSA replaces normal adversary procedure with investigatory procedure. *Sims*, 530 U.S. 103. SSA "conduct[s] the administrative review process in an informal, nonadversary manner." *Id.* (quoting 20 CFR § 404.900(b)). The Council, not the claimant, has primary responsibility to identify and develop the issues. *Id.* at 112. Plaintiff was not represented at the hearing, and the ALJ had the responsibility to identify and develop the issues. The record does not show whether the ALJ considered Plaintiff's alleged lack of financial resources. The record does show that the ALJ did not seek clarification regarding the Glenn-Garrett Clinic document, allegedly from a treating physician, and which the ALJ mistakenly identified as a 1993 rather than a 2003 document. The

record shows that the ALJ did not consider the objective medical evidence and findings relevant to back and shoulder pain.

## **CONCLUSION**

Having reviewed the record, this Court determines that the record shows neither that the Administration correctly applied the applicable legal standards nor that substantial evidence supports the Administration's determination that Plaintiff is not disabled. The Court therefore

**ORDERS**, **ADJUDGES,** and **DECREES** that this action is **REVERSED** and **REMANDED** for further development; and

**ORDERS** that all motions not previously ruled on are denied.

SIGNED this 22nd day of September, 2008.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE